UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
        UNITED STATES          )
                               )    CRIMINAL ACTION
            v.                 )    No. 10-10394-WGY
                               )
        CALVIN DEDRICK         )
                Defendant.     )
_____)
```

MEMORANDUM

YOUNG, D.J.                                    January 17, 2012

## I.    INTRODUCTION

Assumptions ought not be drawn where not necessary.  This is
the essence of the Ockham's razor; when the simplest explanation
seems correct, complex theories ought not be postulated without
necessity (entia non sunt multiplicanda praeter necessitatem).

This is a motion to suppress evidence, where the defendant
wants the Court to speculate as to alternative theories
concerning where he stored the drugs sold in two controlled buys
occurring in the hallway outside his apartment.  This Court is
bound to analyze the facts in a common-sense rather than a
hypothetical fashion.  Absent a good reason to adopt more
complicated theories, this Court rejects the defendant's
hypothetical interpretation of the facts, which would require it
to adopt unnecessary assumptions.  Here, the simplest explanation

is that the defendant retrieved the drugs from his apartment, while the buyer waited in the hallway.

Calvin Dedrick ("Dedrick") filed a motion to suppress evidence seized by the Boston Police Department on September 22, 2010, during the search of Apartment #2 at 9 Brinsley Street, Dorchester, MA ("Apartment #2"). Dedrick argues that the application in support of the search warrant was deficient because the affidavit failed to establish probable cause to search Apartment #2; that, more specifically, the affidavit failed to provide a foundation to search the third floor portion of Apartment #2; that the affidavit omitted information regarding other people who lived in that apartment; and that the search warrant does not pass muster under the Massachusetts Constitution and thus, pursuant to the "silver platter doctrine," the evidence seized cannot be admitted in federal court.

**A.    Procedural Posture**

On November 16, 2010, Dedrick was indicted for possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1), possession of a firearm with an obliterated serial number in violation 18 U.S.C. § 922(k), possession of a controlled substance (cocaine) with intent to distribute in violation of 21 U.S.C. § 841(a)(1), and possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A). Indictment, ECF No. 1. On November 19, 2010, Magistrate Judge

Judith G. Dein ordered the detention of Dedrick on the grounds that he constitutes a danger to the community and poses a serious risk of flight.  Mem & Order Detention, ECF No. 4.  On October 11, 2011, Dedrick filed a motion to suppress evidence seized by the Boston Police Department on September 22, 2010, during the search of Apartment #2.  Mot. Suppress Evidence ("Def.'s Mot."), ECF No. 19.  On October 17, 2011, Dedrick filed his Memorandum in Support.  Def.'s Prelim. Mem. Supp. Mot. Suppress Evidence ("Def.'s Mem."), ECF No. 21.  On October 18, 2011, the government filed its opposition.  Opp'n Mot. Suppress ("Gov't's Opp'n"), ECF No. 22.  On October 21, 2011, Dedrick filed a response to government's brief in opposition.  Def.'s Resp. Gov't's Opp'n Mot. Suppress Evidence ("Def.'s Resp."), ECF No. 23.  This Court denied the motion to suppress without prejudice on October 26, 2011.

**B.  Facts**

The facts herein are as alleged by the government.  On September 20, 2010, Boston Police Sergeant Detective Albert M. Terestre ("Sergeant Terestre") submitted an application for a search warrant and affidavit in support of the search of Apartment #2.  Def.'s Mem., Ex. A, Appl. Search Warrant, ECF No. 21-1.  The warrant was issued on the same date by the Dorchester District Court.  Gov't's Opp'n, Ex. 1, Search Warrant, ECF No. 22-1.  On September 22, 2010, the police stopped Dedrick at

approximately 2:20 pm and advised him of the search of Apartment
#2.  Gov't's Opp'n, Ex. 2, Incident Report ("Incident Report") 3,
ECF No. 22-1.  Dedrick was placed in a marked police cruiser and
handcuffed for officer safety.  Id.  Officers subsequently found
bags of cocaine and crack in the car with Dedrick, and Sergeant
Terestre arrested Dedrick and advised him of his Miranda rights.
Id.

The basis of the search of Apartment #2 was the
investigation carried out by members of the Boston Police
Department and an affidavit prepared by Sergeant Terestre.
Gov't's Opp'n, Ex. 1, Aff. Albert M. Terestre (the "Affidavit" or
"Aff."), ECF No. 22-1.  The Affidavit relies on information
provided by a confidential informant, referred to as "Miz" ("the
Informant").  Aff. 1.  The Informant had previously provided
information that led to the arrest and conviction of another
individual, Darian Brewer, for possession of cocaine with intent
to distribute.  Id.  In that case, the defendant entered a guilty
plea and the Informant's credibility was not challenged.  Def.'s
Mem. 3.

The Informant told Sergeant Terestre that a black male with
the nickname "C-Dog," later identified as Dedrick, was selling
crack cocaine out of the second floor at 9 Brinsley Street,
Dorchester, Massachusetts.  Aff. 1.  The Informant said that he
knew this because he had purchased crack in the past by calling a

particular telephone number used by C-Dog and going to the second floor of 9 Brinsley Street to buy the drugs. Id. Sergeant Terestre stated that the target of the investigation was Dedrick who was believed to be selling drugs from:

> 9 Brinsley St., Dorchester, Massachusetts, [which] is a 3 story, 2 family residential wooden dwelling, with dark beige vinyl siding and tan vinyl trim . . . The building is a two family dwelling, with one apartment on the 1st floor and one apartment on the 2nd floor (which is apartment #2, the target of this investigation). Apartment #2 consists of an upstairs (3rd fl.) and downstairs (2nd fl.)[.] [sic] [T]he apartment door is a brown wood door and is the only door on the 2nd floor front landing.

Id. at 1-2. The Affidavit mentioned that a query of the City of Boston Assessing Department revealed the owner of record of 9 Brinsley Street to be D.G.[1] Id. at 3. The investigation carried out by the Boston Police Department suggested that Apartment #2 was occupied by or in the possession of Dedrick. Id. at 2. Surveillance of 9 Brinsley Street documented a black male, later identified as Dedrick, on several occasions leaving that residence and entering a blue Ford Explorer bearing a Massachusetts registration number, and registered to the name of

---

[1] Only the initials of the owner's name are given here to protect his privacy. Dedrick argues that the ownership of Apartment #2 prior to 2010 is a material fact that the affidavit omitted. Def.'s Mot. 3. The Affidavit states that Dedrick was occupying Apartment #2 from at least February 23, 2010, making the prior residents of the apartment immaterial. Aff. 2 (including the date, February 23, 2010, NSTAR started billing Dedrick for utilities at Apartment #2, and Dedrick's telephone number and social security number registered in the account).

Dedrick at "9 Brinsley Street, #2." Id. Sergeant Terestre also

contacted N-Star and learned that since February 23, 2010,

Dedrick was the subscriber for N-Star utilities at 9 Brinsley

Street, Apartment #2. Id. Sergeant Terestre obtained Dedrick's

photograph from the Boston Police Department booking system and

determined that the photograph appeared to be the same person

alleged to be selling drugs at 9 Brinsley Street. Id. The

Informant also identified Dedrick from nine booking photographs

of different individuals as the person from whom he had been

buying drugs at 9 Brinsley Street. Id.

Sergeant Terestre described three controlled buys made by

the Informant and conducted by the Boston Police Department. Id.

at 2-3. The buys occurred at 9 Brinsley Street on the first week

of September 2010, during the third week of September 2010, and

within the 72 hours immediately preceding the request for the

search warrant.[2] Id.

---

[2] The affidavit contains an obvious typographical error as
to the chronology of the controlled buys. It describes the first
controlled buy as having occurred during the third week of
September 2010, and then a second controlled buy that occurred
during the first week of September 2010. Cf. Aff. 2 and 3. The
second controlled buy plainly could not have occurred earlier
than the first. Moreover, the affidavit describing all three
controlled buys was written on September 20, 2010, id. at 1, a
date that itself was within the third week of September. The
government explains that "all three controlled buys had to have
occurred during that same third week." Gov't's Opp'n 3 n.2.
Given that Dedrick did not raise the issue in his response,
Def.'s Resp., this Court will not address it, and absent a better
explanation, this Court will treat the controlled buys as having
occurred in the order they are described in the Affidavit,

On each of the three control buys, the Boston Police Department first searched the Informant to ensure s/he was not then in possession of drugs; provided the Informant with money to purchase drugs; kept the Informant under visual surveillance from that point until s/he reached 9 Brinsley Street; saw the Informant meet on the porch with a black male (positively identified as Dedrick on the third occasion) and then enter the building; saw the Informant emerge from 9 Brinsley Street some minutes later; kept the Informant under continuous surveillance until s/he arrived at a prearranged location; received from the Informant a plastic bag containing what appeared to be crack cocaine; received a narrative from the Informant regarding the purchase of the crack from Dedrick; and then again searched the Informant to ensure that s/he had no money. <u>Id.</u> at 2-3.

During the first controlled buy, the police observed the Informant on the front porch of 9 Brinsley Street speaking with a black male and entering the exterior door at that address with this same male. <u>Id.</u> at 2. After the controlled buy the Informant turned over to Police Officer Rogers a plastic bag of cocaine purchased at 9 Brinsley Street. <u>Id.</u> The Informant stated that s/he met a man named "C-Dog" on the front porch and they walked together into the building. <u>Id.</u> Then C-Dog told the

_____

assuming that the first controlled buy described in the Affidavit occurred chronologically first and so on.

Informant to wait in the hallway just inside the outer doorway.
Id. C-Dog walked upstairs to the second floor hallway and into
Apartment #2. Id. When C-Dog returned from Apartment #2, he
removed a plastic bag with cocaine from his pants pocket and
handed it to the Informant, who then paid and left the building.
Id.

During the second controlled buy, the police observed the
Informant on the front porch of 9 Brinsley Street speaking with
the same black male as on the previous occasion and both entered
the exterior door. Id. at 3. The Informant stated that s/he
purchased drugs from C-Dog at the foot of the stairway to the
second floor of 9 Brinsley Street (this time Dedrick did not
enter Apartment #2). Id. C-Dog removed a plastic bag with
cocaine from his groin, handed it to the Informant, and took the
Informant's money, who then left the building. Id.

The third controlled buy occurred within 72 hours of the
application for the search warrant. Id. The police observed the
Informant on the front porch of 9 Brinsley Street speaking with
the same black male as on the two previous occasions. Id. By
now, this man also known as C-Dog had been identified as Dedrick.
Id. Both entered through the exterior door. Id. The Informant
stated that s/he purchased the drugs from C-Dog while standing in
the second floor hallway at 9 Brinsley Street. Id. The
Informant further stated that C-Dog took the money and left

8

Informant waiting in the second-floor hallway while C-Dog walked into Apartment #2.  Id.  When Dedrick, referred by the Informant as C-Dog, came out of Apartment #2 into the hallway, he removed a plastic bag with cocaine from his pants pocket and handed it to the Informant, who then left the building.  Id.

Based on the investigation carried out by the Boston Police Department and the Informant's statements contained in the Affidavit, Sergeant Terestre opined that crack cocaine was being illegally stored at and distributed from Apartment #2, and requested that a search warrant be issued for "9 Brinsley St., apartment #2, Dorchester, MA; including all rooms, common area, storage areas, basement, closets and terrace/porch areas directly within or associated to 9 Brinsley St. #2 in the Dorchester section of the city of Boston."  Id. at 3.  The request specified that authorities would be looking for crack or any other drugs, id. at 3-4, various items associated with drug distribution, and materials reflecting occupancy or control of Apartment #2 by Dedrick.  Id. at 3.

On September 22, 2010, the Boston Police Department searched Apartment #2 at 9 Brinsley Street.  Incident Report 3.  The Boston Police Department recovered during the search a Coolpix box with a scale, two plastic bags of marijuana, and $73.00 in U.S. currency from the night stand in the third-floor bedroom; a Smith & Wesson firearm loaded with ten rounds of ammunition,

9

another clip loaded with six rounds of ammunition, scissors, cut-off baggies, unused baggies, and a razor with apparent cocaine residue, all these items from a shaving bag on the top shelf of the closet for the third-floor bedroom; a plastic bag containing powder cocaine from a sweatshirt in a closet; $1,400 in U.S. currency from a fur coat in the closet; and various documents and photographs of Dedrick from various locations in the bedroom. Gov't's Opp'n, Ex. 3, Search Warrant Inventory Form 1-2, ECF No. 22-1.

## II.  ANALYSIS

### A.  Legal Standard

The Fourth Amendment requires that a warrant "particularly describe[e] the place to be searched."  U.S. Const. amend. IV. This proscription serves to protect the "indefeasible right of personal security, personal liberty, and private property." United States v. Hinds, 856 F.2d 438, 441 (1st Cir. 1988) (citations omitted).  Probable cause for a search exists where information in the affidavit is sufficient to "'warrant a man of reasonable caution' to believe that evidence of a crime would be found" in the location to be searched.  United States v. Feliz, 182 F.3d 82 (1st Cir. 1999) (citing Texas v. Brown, 460 U.S. 730, 742 (1983)(plurality opinion)).  The determination of whether probable cause exists must not rest on isolated facts; rather, it depends upon the cumulative effect of the facts in the totality

of circumstances.  <u>Illinois</u> v. <u>Gates</u>, 462 U.S. 213, 230–32 (1983).

**B.    The Search Warrant Affidavit Established the Necessary Nexus Between the Crime And the Place to Be Searched.**

Dedrick alleges that the search warrant Affidavit did not support a finding of probable cause.  Def.'s Mem. 6. Specifically, Dedrick argues that the Affidavit lacked reliable facts to support a sufficient basis of knowledge in order to search Apartment #2.  <u>Id.</u> at 7.  This Court disagrees.

"The standard we apply in determining the sufficiency of an affidavit is whether the 'totality of the circumstances' stated in the affidavit demonstrates probable cause to search either the premises or the person."  <u>United States</u> v. <u>Khounsavanh</u>, 113 F.3d 279, 283 (1st Cir. 1997) (quoting <u>Gates</u>, 462 U.S. at 238).  "An affidavit supporting a request for a search warrant must give the magistrate a 'substantial basis' upon which to conclude that there is such a 'fair probability.'"  <u>Gates</u>, 462 U.S. at 238-39. "The affidavit is to be interpreted in a common-sense rather than a hypothetical or hypertechnical manner."  <u>United States</u> v. <u>Garcia</u>, 983 F.2d 1160, 1167 (1st Cir. 1993) (citing <u>Gates</u>, 462 U.S. at 236).

Dedrick primarily advances a single theory.  He argues that the Affidavit contains facts showing that the Informant made three purchases of drugs in the stairway and hallway leading to Apartment #2, but the Affidavit does not contain any facts

showing that the Informant had been inside Apartment #2 or that
s/he knew it extended up to the third floor.  Def.'s Mem. 3.
Dedrick suggests that the Affidavit "did not eliminate the
likelihood that the seller in the apartment building hallway,
stored the substance elsewhere, or transported the substances
with him from his motor vehicle or from outside the residence."
Id. at 6.  Therefore, Dedrick argues, the Informant lacked the
basis of knowledge required to search inside Apartment #2, which
contained both an upstairs (third floor) and downstairs (second
floor).  See id. at 7.  Dedrick adds that the Affidavit does
specify whether the hallway where each transaction occurred was
the first floor or the second floor hallway.  Id. at 4.

    Dedrick's arguments are not supported by the facts or
precedents.  The Affidavit relied on the Informant's knowledge
and also on the investigation of the Boston Police Department.
See United States v. Vargas, 931 F.2d 112, 115 (1st Cir. 1991)
("[P]olice surveillance of the premises supplied independent
corroboration of the informant's allegations.").  Cf.
Khounsavanh, 113 F.3d at 285, 288 (holding that a controlled buy
does not establish probable cause per se).  The Affidavit
demonstrates that Sergeant Terestre's own investigation revealed
that Apartment #2 at 9 Brinsley Street was on the second floor,
which consists of an upstairs on the third floor and downstairs
on the second floor.  Aff. 2.  The Affidavit also states that

Apartment #2 has brown door and "is the only door on the 2nd floor front landing." Id. Given that the only door in the second floor was that of Dedrick's apartment, there was no confusion as to what stairway and hallway the Informant referred to. When the Informant observed Dedrick walk up the stairs and enter the second-floor apartment, he could not have seen Dedrick enter any apartment other than Apartment #2. This is a reasonable conclusion given that the only other apartment in the building was on the first floor.

The Informant observed Dedrick entering and leaving Apartment #2 immediately before handing over plastic bags with drugs during two of the controlled buys. Id. at 2-3. This is sufficient basis of knowledge to infer that the drugs were kept inside the apartment. See Khounsavanh, 113 F.3d at 286. The second controlled buy provides further support for this conclusion. This buy occurred in the second-floor stairway at 9 Brinsley Street. Unlike the other two controlled buys, Dedrick did not have to go upstairs and enter Apartment #2 to retrieve the drugs because he had the plastic bag with drugs in his groin.

The fact that the Informant never entered Apartment #2 during the controlled buys is not fatal to the application for a search warrant. See Khounsavanh, 113 F.3d at 286 (holding that the government had established probable cause for the search of the first-floor rear apartment, even though the "control buy was

less than ideal," and the detective was "unable to verify with
certainty which apartment was the source of the drugs (or even
whether the drugs had been secreted elsewhere in the building, as
the defendant had hypothesized).").  Furthermore, based on two
independent sources, viz., Dedrick's motor vehicle registration
and his subscription for N-Star utilities, Aff. 2, the Affidavit
demonstrated that Apartment #2 was occupied by Dedrick.  When
read in a common sense fashion, the Affidavit establishes a nexus
between Apartment #2 and Dedrick's drug storage and delivery
operation at 9 Brinsley Street.  Even though the Informant did
not go into Apartment #2, the Informant's observations and the
police investigation provided a substantial basis for concluding
that evidence connected to the crime would be found on Apartment
#2.

     Dedrick claims that the Affidavit "did not eliminate the
likelihood that the seller in the apartment building hallway,
stored the substance elsewhere, or transported the substances
with him from his motor vehicle or from outside the residence."
Def.'s Mem. 6.  This reading of the Affidavit defies common-
sense: Dedrick went upstairs into Apartment #2 to retrieve the
drugs, while the Informant waited in the hallway, but when
Dedrick had the drugs on him, the transaction occurred in the
hallway and he need not go into Apartment #2.  Dedrick's
alternative theories are hypothetical and hypertechnical, and do

not contradict the fact that the magistrate found with a "fair probability" that the drugs were stored and kept in Apartment #2. See Garcia, 983 F.2d at 1167 (holding that there was probable cause even though police only saw the informant enter and exit the premises during a controlled buy, and stating that defendant's argument that the "informant might have stashed cocaine elsewhere in the building out of the sight of the detective," was "not probable and strains credulity on a common-sense reading.").

Therefore, it was reasonable to infer that Dedrick was dealing drugs that he stored in his second-floor apartment because Dedrick was seen entering and leaving Apartment #2 immediately before handing over drugs in two controlled buys.

### C. The Affidavit Provided a Foundation to Search the Third Floor of Apartment #2

Dedrick next argues that the government failed to establish a reliable "basis of knowledge" to support a finding of probable cause for the search of the third floor because the third floor and Apartment #2 were different units. Def.'s Resp. 1.

Dedrick relies on United States v. Baldacchino, 762 F.2d 170, 177 (1st Cir. 1985) ("When a structure is divided into more than one residential unit, there must be cause to search each unit."). Def.'s Resp. 1. Dedrick's reliance on Baldacchino is misplaced. In Baldacchino, the defendant claimed that the police

conducted a comprehensive room-to-room search of an inn without
cause to believe the defendant was in any particular room,
forcing the doors of other guests' rooms.  762 F.2d at 173.  Each
room of the inn constituted a unit with distinctive occupants,
doors, and numbers.  Id.  In Baldacchino, the First Circuit cited
United States v. Whitten, 706 F.2d 1000, 1008 (9th Cir. 1983), in
requiring probable cause to search each residential unit of a
building.  Baldacchino, 762 F.2d at 177 (citing Whitten, 706 F.2d
at 1008 ("A search covering an entire street address is
authorized where probable cause exists as to one portion of a
multiunit building only when the building is used as a single
entity or the suspect is in control of the whole premises.")).
The First Circuit, however, held that "[w]hile [the court] could
not condone an indiscriminate room-to-room search," the district
court found probable cause for the defendant's specific room
based on the totality of the circumstances.  Id. at 178.

    In the case at bar, contrary to Baldacchino, Dedrick has not
show any evidence that the third floor is a different unit, has
an independent entrance, a different number, is treated as a
single entity, or controlled by residents other than Dedrick.  On
the contrary, the Affidavit sufficiently described the target
apartment as a unit, consisting of an upstairs on the third floor
and a downstairs on the second floor as well as a stairway
leading to "the only door on the 2nd floor front landing."  Aff.

16

2.  Furthermore, some courts have held that a specific address "should be considered to describe the entire premises or property identified."  E.g., United States v. Silva, 593 F. Supp. 2d 316, 318 (D. Mass. 2009) (Gorton, J.).

First Circuit precedents clearly suggest that the search of the third floor was appropriate under the search warrant terms. In United States v. Asselin, 775 F.2d 445, 447-48 (1st Cir. 1985), the court held that a warrant for certain "premises" included a disabled Cadillac next to a carport and a birdhouse hanging fifteen feet away from the trailer home.  In United States v. Hinds, 856 F.2d 438 (1st Cir. 1988), the court held that a warrant authorizing  "a search of the whole building" included a search of the defendant's fourth floor living quarters because the top floor on which defendant lived was not separated from the floors below by a door.  856 F.2d at 441-42 (holding the search was legal even though the warrant mistakenly called the building a three-story house instead of a four-story house) (internal quotation marks omitted).  Similarly, in United States v. Ferreras, 192 F.3d 5, 11 (1st Cir. 1999), the court held that in the warrant to search the second-floor apartment of a building included the attic because it was connected to the second floor apartment, lacked an exit to the street, and was not equipped for "independent living."

Dedrick also argues that "[n]either the [I]nformant, nor the affiant, discloses a factual basis to support a search of the third floor of the residence." Def.'s Mem. 4. This claim has no merit. The Affidavit only had to give the magistrate a substantial basis to conclude that there was a fair probability that contraband or evidence of a crime would be found in the apartment. See Gates, 462 U.S. at 238.

Here, Sergeant Terestre described Apartment #2 as consisting of both the second and third floor, relying on his own investigation and the Informant's statements. Cf. Vargas, 931 F.2d at 115 ("[P]olice surveillance of the premises supplied independent corroboration of the informant's allegations."). As the third floor was part of Apartment #2, there is sufficient basis of knowledge to infer that the drugs were kept inside, because the third floor did not have an independent entrance and the Informant observed Dedrick entering and leaving Apartment #2 immediately before the exchange of drugs in two controlled buys. See Aff. 2 (stating that the third floor was connected to the second floor and the only access to Apartment #2 was through the "door on the 2nd floor front landing."). Based on the Affidavit, the magistrate could conclude that it was probable that the drugs were stored somewhere in Apartment #2 including the third floor, because the Affidavit sufficiently described Apartment #2 as a two story apartment that occupies the second floor and the third

18

floor with only one access door on the second floor.

Therefore, the warrant properly authorized the search of the third floor of Apartment #2.

### D. The Affidavit Did Not Have to Inform the Magistrate About Other Residents

Dedrick makes a tangential argument that the warrant omitted facts concerning the identities of other residents at the multiple occupancy residence. Def.'s Mot. 3. Dedrick does not elaborate on this claim and this Court will not embark on a lengthy discussion of a legal issue the moving party has not bothered to argue. This Court cannot identify from Dedrick's pleadings whether the motion refers to the residents of Apartment #1, the only other apartment in the building besides Dedrick's apartment, and not within the scope of the warrant; or whether it refers to other individuals such as the previous renters, who left on or about 2009 before Dedrick occupied Apartment #2; or whether the claim refers to other individuals. Without further elaboration, the Court has no guidance as to the basis of this claim. The warrant sufficiently described the place to be searched within the multi-unit building and named the person renting the apartment to be searched. Aff. 1-2; United States v. Vaughan, 875 F. Supp. 36, 42 (D. Mass. 1995) (holding that the warrant was valid because it limited the search area to that occupied by or in the possession of the defendant, and it adequately specified the name of the defendant as the occupant of

19

the subunit).  This Court holds that the Affidavit sufficiently
described Apartment #2 and established the identity of Dedrick.
Nothing more is required.

###### E.    The Silver Platter Doctrine

Finally, and most imaginatively, Dedrick contends that the
search warrant of Apartment #2 does not pass muster under the
Massachusetts Constitution and thus, pursuant to the "silver
platter doctrine," the evidence seized cannot be admitted in
federal court.  Def.'s Mem. 10.  This Court disagrees.

Generally, "there is no constitutional requirement that
evidence obtained in another jurisdiction be suppressed merely
because the process of acquisition offended some local law."  1
Wayne R. LaFave, Search and Seizure, § 1.5(c), at 176 (4th ed.
2004).  See, e.g., On Lee v. United States, 343 U.S. 747, 754
(1952) ("[V]iolation of state law . . . would not render the
evidence obtained inadmissible in federal courts."); United
States v. Soule, 908 F.2d 1032, 1038 (1st Cir. 1990) (holding
that a state court search warrant "resulting in federal
prosecution is evaluated under federal standards"); see also
United States v. Vite-Espinoza, 342 F.3d 462, 471 (6th Cir. 2003)
(concluding that suppressing evidence is not the appropriate
remedy in federal courts when a violation of state constitution
occurred); United States v. Bach, 310 F.3d 1063 (8th Cir. 2002)
("[F]ederal courts in a federal prosecution do not suppress

evidence that is seized by state officers in violation of state law.").

Federal law governs federal prosecutions in federal court. <u>United States</u> v. <u>Sutherland</u>, 929 F.2d 765, 769 (1st Cir. 1991). As a general rule, courts exclude evidence seized by federal officers in violation of the Fourth Amendment.  <u>See</u> <u>Mapp</u> v. <u>Ohio</u>, 367 U.S. 643 (1961); <u>see also</u> <u>Elkins</u> v. <u>United States</u>, 364 U.S. 206, 212-13 (1960) (overruling <u>Weeks</u> v. <u>United States</u>, 232 U.S. 383 (1914)).

Until <u>Elkins</u>, federal courts could receive evidence obtained by state officers by means forbidden to federal officers: the so-called "silver platter" doctrine.[3]  <u>Elkins</u>, 364 U.S. at 213 (overruling <u>Weeks</u>, 232 U.S. 383 that held that "the 4th Amendment is not directed to individual misconduct of [state] officials. Its limitations reach the Federal government and its agencies," <u>id.</u> at 398); <u>cf.</u> <u>Commonwealth</u> v. <u>Wilkins</u>, 243 Mass. 356, 360 (1923).  Soon after, the Supreme Court applied the exclusionary rule to the states through the Due Process Clause.  <u>Mapp</u> v. <u>Ohio</u>, 367 U.S. 643 (1961).  This put paid to the silver platter doctrine as it had originally appeared in our jurisprudence.

_____

[3] The term "silver platter" was first used in <u>Lustig</u> v. <u>United States</u>, 338 U.S. 74, 78-79 (1949) ("The crux of that doctrine is that a search is a search by a federal official if he had a hand in it; it is not a search by a federal official if evidence secured by state authorities is turned over to the federal authorities on a silver platter.").

Today, evidence obtained in violation of the United States

Constitution must be suppressed:

> (i) when the search was by the state officers and the
> evidence is offered in a federal prosecution; (ii) when
> the search was by federal officers and the evidence is
> offered in a state prosecution; and (iii) when the search
> was by officers in one state and the evidence is offered
> in a prosecution in another state.

1 Wayne R. LaFave, <u>Supra</u> Section II.E, at 175 (citations

omitted).

In states that are more protective of civil liberties than

is the federal Constitution, however, a different scenario may

arise.  There, state officials could conceivably make an "end

run" around more restrictive state constitutions by delivering

evidence seized in violation of a state's constitution and

handing such evidence on a silver platter to federal officials

acting under the more relaxed federal Constitution.

Massachusetts is such a state.

Article 14 of the Massachusetts Declaration of Rights is

more protective of individual liberties in its treatment of

search and seizure issues than is the Fourth Amendment to the

United States Constitution.  Mass. Const. pt. 1, art. 14; <u>see</u>

Herbert P. Wilkins, <u>The Massachusetts Constitution - The Last</u>

<u>Thirty Years</u>, 44 Suffolk U. L. Rev. 331, 337 (2011).  In 1983,

the Supreme Court adopted a more relaxed "totality-of-the-

circumstances" standard for probable cause inquiries under the

Fourth Amendment.  <u>Gates</u>, 462 U.S. at 238.  Massachusetts,

however, has not followed the Supreme Court. In <u>Commonwealth</u> v.

<u>Upton</u>, 394 Mass. 363, 374-76 (1985), Massachusetts adhered to the

earlier standards developed in <u>Aquilar</u> v. <u>Texas</u>, 378 U.S. 108

(1964), and <u>Spinelli</u> v. <u>United States</u>, 393 U.S. 410 (1969), with

their two prong standard - the basis of knowledge test and the

veracity test.

Because Massachusetts has a more stringent standard, in some

cases a search and seizure would be unreasonable under article

14, yet constitutional under the Fourth Amendment. <u>E.g.</u>, <u>compare</u>

<u>Guiney</u> v. <u>Police Commissioner</u>, 411 Mass. 328 (1991) (holding that

rule prescribing random urinalysis testing of Boston police

officers imposes unreasonable search under Massachusetts

Declaration of Rights), <u>with</u> <u>National Treasury Emps. Union</u> v. <u>Von</u>

<u>Raab</u>, 489 U.S. 656, 666-67 (1989) (holding that custom service is

not required to obtain warrant prior to drug testing employees);

<u>see, e.g.</u>, <u>Commonwealth</u> v. <u>Blood</u>, 400 Mass. 61, 67-69 (1987)

(holding that warrantless surveillance violates the right to

privacy protected by article 14 of the Massachusetts Declaration

of Rights, although it is not a violation of the federal

Constitution). The difference between the standards does not, of

course, mean that "in federal prosecutions evidence admissible

under federal law can[] be excluded because it would be

inadmissible under state law." <u>Soule</u>, 908 F.2d at 1039 n.13

(quoting <u>United States</u> v. <u>Quinones</u>, 758 F.2d 40, 43 (1st Cir.

1985)).

The First Circuit previously suggested, however, that federal courts could exclude evidence that state law enforcement officers, without the participation of federal officials, gathered in knowing violation of Massachusetts law, thus rendering the evidence inadmissible in the courts of the Commonwealth but admissible in federal court.  The court noted that this would permit federal officials to use illegally seized evidence that was handed to them on a "silver platter."  United States v. Pratt, 913 F.2d 982, 986 (1st Cir. 1990) cert. denied, 498 U.S. 1028 (1991); see also United States v. Jarabek, 726 F.2d 889 (1st Cir. 1984).

The silver platter doctrine is now almost eliminated in the First Circuit.  The court held in Sutherland that the "poorly conceived" silver platter doctrine did not apply because the facts supported that it was a joint federal-state investigation and the admissibility of the wiretap evidence was thus a pure question of federal law, even if the evidence had been used initially in a state prosecution.  929 F.2d at 770 ("[Jarabek] certainly does not delineate an exception to the general rule that federal law governs in federal prosecutions.").  Analyzing the silver platter doctrine, the First Circuit noted that the doctrine is very narrow and applies only to "extreme case[s] of flagrant abuse of the law by state officials, where federal

24

officials seek to capitalize on that abuse." The court noted that "[n]one of our cases has actually found circumstances supporting an exception, nor have other courts reached this result." Id. at 770-71. But see United States v. Fernandez, 578 F. Supp. 2d 243, 247 (D. Mass. 2008) (Gorton, J.) (noting that in "'an extreme case of flagrant abuse of the law by state officials, where federal officials seek to capitalize on that abuse' a federal court may exercise its supervisory power to exclude evidence") (quoting Sutherland, 929 F.2d at 770)).

Were this the holding of Sutherland, analysis here would be at an end. But it is not. Because Sutherland involved a joint federal-state search, the quoted passage is but dicta. Grasping this slim reed, Dedrick seeks suppression. His argument is unavailing.

Here, the investigation was exclusively carried out by state officers. Dedrick's only argument is that the Affidavit supporting the issuance of the warrant was insufficient under the more stringent two prong Aquilar-Spinelli test and of Massachusetts General Laws, chapter 276, section 2. Dedrick nowhere establishes that Sergeant Terestre engaged in a knowing and flagrant violation of Massachusetts law. On this ground alone, this Court would be warranted in denying the motion to apply the silver platter doctrine here. What is more, the knowledge prong under Upton was satisfied by the Informant's

personal knowledge and corroborated by the Boston Police
Department investigation. See Upton, 394 Mass. at 375-76. Under
Massachusetts law, "[t]he central inquiry is whether the
affidavit accompanying the search warrant sets forth probable
cause to believe that the drugs or related evidence from the drug
delivery service are likely to be found at the defendant['s]
residence." Commonwealth v. Luthy, 69 Mass. App. Ct. 102, 105
(2007). "When that location is a residence, there must be
specific information in the affidavit, and reasonable inferences
a magistrate may draw, to provide 'a sufficient nexus between the
defendant's drug-selling activity and his residence to establish
probable cause to search the residence.'" Commonwealth v. Pina,
453 Mass. 438, 440-441 (2009) (quoting Commonwealth v. O'Day, 440
Mass. 296, 304 (2003)). "The affidavit need not convince the
magistrate beyond a reasonable doubt, but must provide a
substantial basis for concluding that evidence connected to the
crime will be found on the specified premises." Commonwealth v.
Donahue, 430 Mass. 710, 712 (2000) (citing Commonwealth v.
Stewart, 358 Mass. 747, 749 (1971)).

The Informant observed Dedrick entering and leaving
Apartment #2 immediately before Dedrick handed over the drugs in
two controlled buys. Aff. 2-3. This is a sufficient basis of
knowledge to infer that the drugs were kept inside the apartment.
See Commonwealth v. Alcantara, 53 Mass. App. Ct. 591, 593-594

(2002) ("The inability of the police to observe an informant enter a specific apartment during a controlled buy is not fatal to an application for a search warrant." (citing <u>Commonwealth</u> v. <u>Warren</u>, 418 Mass. 86, 90 (1994)). Therefore, the knowledge prong under <u>Upton</u> is satisfied because the Affidavit sufficiently described Apartment #2 regardless of whether the Informant entered the apartment.

The veracity prong under <u>Upton</u> is also satisfied. <u>See</u> <u>Upton</u>, 394 Mass. at 375. The Affidavit states that the Informant had previously provided information that led to the arrest and conviction of a particular individual for possession of cocaine with intent to distribute. Aff. 1. Dedrick contends that the Informant's reliability and veracity were not challenged in that case. The fact that the Informant's personal observations had led to a conviction based on her/his information indicates that s/he was reliable to some extent, even where the Informant's veracity was not challenged because the defendant pled guilty. The Informant's reliability was further established during the controlled buys. <u>See</u> <u>Warren</u>, 418 Mass. at 90-91 (holding that the informant's personal observations during the controlled buy satisfied the veracity prong because the controlled buy was sufficiently supervised by the police even if it does not contain any information regarding the informant's past track record for reliability).

Therefore, the Affidavit satisfies the requirements of article 14 of Massachusetts Constitution, as well as the less stringent Fourth Amendment "totality-of-the-circumstances" standard.

## III. CONCLUSION

For these reasons this Court denied Dedrick's motion to suppress evidence, ECF No. 19, on October 26, 2011.

/s/ William G. Young

_____
WILLIAM G. YOUNG
DISTRICT JUDGE